GARDEN, JUDGE:
These claimants are seeking awards for overtime compensation during a period of time that they were employed as houseparents at the respondent’s facility at Institute, West Virginia. Actually, a total of eleven claims were filed, but counsel agreed to present testimony in only two, believing that the testimony of these two claimants would be representative of all pending claims. Ten of the claims, including these two, were filed on February 21, 1975, and the eleventh, the claim of Paul Leach, was filed on April 23, 1975.
Initially, what must be determined is the applicable period of time during which the claimants allegedly failed to receive the overtime wages to which they were entitled under the West Virginia Minimum Wage and Maximum Hours Standards For Employees. Code 21-5C-8 provides as follows:
*223 “Any employer who pays an employee less than the applicable wage rate to which such employee is entitled under or by virtue of this article shall be liable to such employee for the unpaid wages; an 'agreement by an employee to work for less than the applicable wage rate is hereby declared by the legislature of West Virginia to be against public policy and unenforceable.
In any such action the amount recoverable shall be limited to such unpaid wages as should have been paid by the employer within two years next preceding the commencement of such action. Nothing in this article shall be construed to limit the right of an employee to recover upon a contract of employment.” (Emphasis supplied.)
Claimants contend that, although the actions (with the exception of one) were commenced on February 21, 1975, through their attorney they presented their claims to the Wage and Hour Director of the West Virginia Department of Labor on or about November 15, 1974, and after conducting an investigation, the Director suggested that the claimants file their claims in this Court. Thus, the claimants contend that the two-year period should run from November 15, 1972 to November 15, 1974. With this contention we cannot agree. The wording of the statute quoted above is clear and unambiguous, and we thus hold that the statute mandates the two-year period to be between February 21, 1973 and February 21, 1975. During the early part of this period, the claimants were required to work nine straight days, and then they would be entitled to five straight off days, after which they would again work nine straight days. Under this schedule the claimants were paid a monthly salary in addition to receiving free meals and lodging. On May 1, 1974, as a result of an amendment, the Federal Wage and Hour law became applicable to State employees. Thereafter, on June 7, 1974, the respondent’s housemothers began working a daily eight-hour shift, and the housefathers, on June 30, 1974, went to the eight-hour shift. The evidence in respect to the date of the implementation of the shift work was conflicting, and for the sake of consistency, we here hold that the period of time in question for both housemothers and housefathers is from February 21, 1973 *224 through June 30, 1974. The claim of Paul Leach having been instituted on April 23, 1975, the period in question for him is April 23, 1973 through June 30, 1974.
Counsel for the respondent vigorously contends that at the close of fiscal year 1972-73 and fiscal year 1973-74, insufficient funds were expired in the personal service accounts from which these claims for overtime compensation could have been paid, and that the ability of this Court to make awards has been foreclosed by the decision in Airkem Sales and Service, et al. v. Department of Mental Health, 8 Ct. Cl. 180 (1971). Pay stubs were introduced into evidence by the claimants reflecting that their salaries were paid interchangeably from account numbers 4400-06 and 8044-04. There were insufficient funds in the former account at the close of fiscal 1972-73 and fiscal 1973-74 to pay these claims, but there were sufficient funds in the latter account from which these claims could have been paid each year. Respondent contends that account number 8044-04 is funded by federal monies and that at the close of the fiscal years in question, these funds are not expired and returned to the general revenue account, but are simply transferred to the same account for use during the following fiscal year.
Since these claims were submitted for decision, the Supreme Court of Appeals of West Virginia has decided the case of State ex rel. Crosier v. Callaghan, _ W.Va. _, 236 S.E. 2d 321 (1977), and we believe that case to be dispositive of this particular issue. Crosier, a mandamus action, involved a successful attempt on the part of conservation officers of the Department of Natural Resources to recover overtime wages. Among other defenses, the respondent contended that Code 12-3-17 precluded him from complying with a writ of mandamus, because there were insufficient funds in the current fiscal appropriation to pay for overtime worked by conservation officers. Suffice it to say that Code 12-3-17 was the basis for reaching this Court’s result in Airkem, supra. Justice Harshbarger, speaking for the Court in Crosier, used the following language in disposing of the Airkem defense:
“In this case, Code 12-3-17 and 21-5C-8 must be construed in pari materia. Code 12-3-17, subject to specified excep *225 tions, prohibits any state officer from authorizing or paying any account incurred during any fiscal year out of the appropriation for the following year. Code 21-5C-8, however, expressly authorizes payment of back overtime wages for two consecutive years immediately preceding an employee’s action for unpaid wages. To the extent that retroactive liability for unpaid wages is incurred against an employer, it is incurred at the time liability is determined. Theoretically, an employer could fail to pay correct overtime wages for many years; his liability for two years back payment, however, is not legally incurred under Code 21-5C-8 until the employee prevails in an action to recover the money due. Thus, while work may be performed by government employees in the course of prior fiscal years, the government’s liability for payment of back wages arises at the time they are found to be due.”
Thus, it seems clear that the balance in accounts 4400-06 and 8044-04 at the close of fiscal years 1972-73 and 1973-74 is immaterial. If liability for unpaid wages is determined in this proceeding at this time, it will be paid out of the current personal services appropriation or from a special appropriation. This was made clear by Justice Harshbarger in Crosier, supra, when he used the following language:
“We also find unpersuasive respondent’s argument that mandamus does not lie because there are insufficient funds in this year’s Department of Natural Resources’ personal services appropriation from which to pay petitioner’s overtime compensation: Nor do we believe that it is petitioner’s responsibility to demonstrate factually that there will be an adequate surplus in this year’s fiscal appropriation to cover the payment.
Inherent in respondent’s argument is the premise that petitioner’s right to back wages is contingent upon his finding a fund from which he can be paid and then submitting a blueprint for payment to the Court that does not infringe upon designated fiscal appropriations. This is not correct when, as here, an employee is lawfully entitled to remuneration for services rendered. Where there are un- *226 expended funds in any account which may be lawfully charged with payment of this debt, whether it be from the personal services appropriation or from the general fund in the state treasury, then petitioner is entitled to mandamus directing payment of the amount due.”
During the periods from February 21, 1973, and April 23, 1973 (Leach claim), through June 30, 1974, which we will hereafter refer to as the “critical period”, the minimum wage from February 21, 1973 to June 30, 1973 was $1.40 per hour, and from July 1, 1973 to June 30, 1974, the minimum wage was $1.60 per hour. See Code 21-5C-2. In respect to overtime, Code 21-5C-3 provides in part as follows:
“(a) On and after January one, one thousand nine hundred sixty-seven, no employer shall employ any of his employees for a workweek longer than forty-eight hours, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.”
As indicated earier, the claimants during the critical periods were being paid a monthly salary, and during the hearing it appeared that there was a dispute as to the proper method of converting a monthly salary to an hourly rate. We believe that the proper method of conversion should follow the following principles. The evidence established that claimant Preston, during fiscal 1973-74, was being paid a monthly salary of $410.00. We are of the opinion that this figure should be multiplied by 12 to establish an annual salary, or in this case, $4,920.00. Dividing this figure by the 52 weeks in any given year reflects a weekly salary of $94.62. Again dividing this figure by the 48-hour work week, an hourly wage of $1.97 per hour is determined.
In addition to the above, Code 21-5C-4 provides as follows:
“In determining whether an employer is paying an employee wages and overtime compensation as provided in sections two and three (21-5C-2 and 21-5C-3) of this article, there shall be provided in accordance with the regulations which shall be promulgated by the commission *227 er a credit of twenty-five cents an hour for an employee customarily receiving gratuities, and a reasonable credit for board and lodging furnished to an employee. The commissioner shall promulgate regulations relating to maximum allowances to employers for room and board furnished to employees.”
Some discussion between counsel took place at the hearing concerning credits that respondent should be allowed for meals and lodging furnished to houseparents, and it was suggested that a credit of $1.00 per day for meals and a credit of $26.00 per month for lodging should be allowed. By the same token, if these credits are allowed for respondent, the claimants should be permitted to add these items to their monthly salaries in order to determine their true hourly rate of compensation. Claimant Preston’s salary thus would become $466.00 per month, or an hourly rate of $2.24 per hour. The unfairness of allowing the respondent a monthly credit for meals and lodging, and the corresponding increase in hourly rate to the claimants, is due to the fact that we believe each of the claimants handled his five-day-off periods differently. Claimant Preston permanently remained in his dormitory room at Institute, while claimant Petts, whose home was located in nearby Dunbar, obviously left Institute and spent her five-day-off period at her own residence. For the most part, we believe that increasing claimants’ hourly rate and allowing the respondent a credit for meals and lodging would amount to little more than a washout, and if allowed on an equitable basis, would certainly create a bookkeeping nightmare. We thus conclude and so hold that any allowances for meals and lodging shall not be considered a credit to respondent or by the claimants in arriving at their respective hourly rates.
The pivotal question for decision in these claims is what constitutes “hours worked” and what constitutes “off duty” time as those terms are defined in the statute and in the rules and regulations as promulgated by the Commissioner of Labor. Workweek and hours worked are defined in Code 21-5C-1 as follows:
“ (g) ‘Workweek’ means a regularly recurring period of one hundred sixty-eight hours in the form of seven *228 consecutive twenty-four-hour periods, need not coincide with the calendar week, and may begin any day of the calendar week and any hour of the day.
(h) ‘Hours worked,’ in determining for the purposes of sections two and three (21-5C-2 and 21-5C-3) of this article, the hours for which an employee is employed, there shall be excluded any time spent in changing clothes or washing at the beginning or end of each workday, time spent in walking, riding or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform and activities which are preliminary to or postliminary to said principal activity or activities, subject to such exceptions as the commissioner may by rules and regulations define.”
What is a houseparent and what are his or her duties? The job description of a houseparent as defined by the Division of Vocational Rehabilitation states that a houseparent is a person responsible for supervising students in a dormitory or other living facility. Specific job duties are delineated, such as keeping order in the meal lines during meals, supervising students in the dormitory for cleanliness and care of their rooms, making bed check at night for absenteeism, driving cars to transport students, driving an ambulance in an emergency, reporting abnormal behavior to counselors, supervising grounds during late evening hours, trying to create a home-like atmosphere in the dormitory, and accompanying students on shopping trips. Claimants would expand this list with such activities as providing students with fresh linens, seeing that students are provided with cleaning supplies, meeting weekly with counselors, and driving students to various hospitals, bus depots, and railroad stations; but, by and large, these activities described by the claimants fall within the specific job duties outlined by respondent.
As earlier indicated, during the critical period, houseparents would work for nine straight days and then be off for a period of five days. Thus, it is necessary for us to determine the number of “hours worked” during the first seven days of the nine straight working day periods. A typical houseparent’s *229 day would commence at approximately 6:00 a.m., and after washing and dressing, they would report to the dining room at 7:00 a.m. to monitor the breakfast line until 8:30 a.m., an undisputed hour and one-half of work. At 11:45 a.m. until 12:45 p.m., they would again report to the dining facility for an additional admitted one hour of work. From 4:45 p.m. to 5:45 p.m., they again would monitor in the dining area, again admitted as an hour worked. From 6:00 p.m. until 10:00 p.m., the houseparents were required to patrol the grounds or be in attendance with the students in the recreation hall, an admitted four hours of work. Between 10:00 p.m. and 11:00 p.m., the houseparents conducted bed checks and supervised lights out.
Basically, the hours in dispute are the hours between breakfast (3 hours and 15 minutes), the hours between lunch and supper (4 hours) and the sleeping hours, roughly between 11:00 p.m. and 6:00 a.m. Much testimony was introduced on behalf of the claimants establishing that quite frequently the sleeping hours of the houseparent would be interrupted by students returning to the center in an intoxicated condition, students locking themselves out of their rooms when going to the toilet, students becoming ill during the night, and a myriad of other nocturnal disturbances. We believe that the issue of the compensability of sleeping hours is answered by the regulations promulgated by the West Virginia Department of Labor, specifically, Section 3.11 of Begulation III, which reads as follows:
“ (a) Where an employee is required to be on duty twenty-four hours or more, the employer and employee may agree on bona fide meal periods and a bona fide regularly scheduled sleeping period of not more than eight hours from hours worked, provided adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night’s sleep. Where no expressed or implied agreement to the contrary is present, the eight hours of sleeping time and lunch periods constitute hours worked(Emphasis supplied.)
The record is entirely silent of either an expressed or an implied agreement that sleeping hours and lunch periods are *230 not to be considered hours worked, and we are thus constrained to hold that the same are to be considered hours worked.
An abundance of testimony, undisputed by claimants, was introduced by respondent establishing that it was the custom of respondent to excuse claimants from duty upon their request so that they might attend to personal matters. These requests, depending on the individual claimants, varied as to frequency but would take place during the morning and afternoon hours. In an attempt to be fair and equitable, in view of what may be considered an artificial and unjustified posture in respect to sleeping time, we are of the opinion that a one-half hour period in the morning and a like period in the evening should not be considered hours worked in accordance with Code 21-5C-1 (h). We also believe that, of the total time (7 hours and 15 minutes) between breakfast and lunch and lunch and dinner, at least five hours should not be considered hours worked. Consequently, in each of the first seven days of the nine straight days worked by claimants, we hold that they should be credited with 18 hours worked. This results in a work week of 126 hours, 48 of which are at the regular hourly rate and the remaining 78 hours at the rate of one and one-half times the regular rate.
It probably should have been noted at the outset of this opinion that this Court was not requested to arrive at monetary awards, but rather was requested only to establish guidelines from which counsel for the parties could compute any awards that might be due the various claimants. We have indicated our opinion in respect to the initial seven straight days worked by the respective claimants. The remaining two days of the nine-day schedule would, so to speak, be worked at the regular rate of 18 hours per day and as a consequence, claimants would not be entitled to overtime compensation.
Both claimant and respondent have access to records establishing during the “critical period” the days worked and the days taken by the claimants as either annual leave time or sick time, during which the claimants should be paid on a 48-hour-per-week basis computed on the hourly rate as set forth earlier *231 in this opinion. Also to be included under the same reasoning is the two-week leave period granted to claimant Preston, and denominated “professional leave” following his attack by a student during which claimant suffered personal injuries in February of 1974.
The Court trusts that within the parameters laid down in this opinion, counsel for the parties can agree in respect to additional compensation that may be due and owing, if any, to each of the claimants. If that can be done and an appropriate Stipulation be thereafter tendered, appropriate awards could then be made by this Court.